# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT KNOXVILLE

| | | |
|---|---|---|
| PAUL J. JOHNSON, JR., | ) | |
| | ) | |
| *Petitioner*, | ) | Case No. 3:24-cv-409 |
| | ) | |
| v. | ) | Judge Atchley |
| | ) | |
| WARDEN CHANCE LEEDS, | ) | Magistrate Judge McCook |
| | ) | |
| *Respondent*. | ) | |

## MEMORANDUM OPINION AND ORDER

Petitioner Paul J. Johnson, Jr., is challenging his 2013 Knox County, Tennessee, judgments of conviction for felony murder and aggravated child abuse in this federal habeas action under 28 U.S.C. § 2254. [Doc. 2]. Respondent has moved to dismiss the Petition as time-barred [Doc. 8], and Petitioner has filed a response opposing the Motion [Doc. 13]. For the reasons set forth below, Respondent's Motion [Doc. 8] will be **GRANTED**, and the instant Petition will be **DISMISSED WITH PREJUDICE**.

## I. RELEVANT FACTUAL AND PROCEDURAL HISTORY

On direct appeal, the Tennessee Court of Criminal Appeals ("TCCA") summarized the trial evidence as follows:

> This case arose after the eighteen-month-old victim was admitted to East Tennessee Children's Hospital and later passed away due to his injuries. The victim's mother, Aja McBayne, testified that the victim was born on January 14, 2007, and that he did not suffer from any health problems. She met the defendant while both were attending Pellissippi State Community College, and they became friends. This friendship progressed briefly to a sexual relationship. After the sexual relationship "tapered off," the relationship returned to a friendship. In July of 2008, the sexual relationship was over, and the two "h[u]ng out" as friends. The defendant would occasionally "hang out" at the victim's mother's residence, and he would provide her with transportation when she needed rides.
>
> In July of 2008, the victim's mother's apartment complex discovered that she had been convicted of a felony, and they gave her ten days to vacate the premises. At

the time of the incident, she still had access to her apartment and was in the process of moving. She was convicted of conspiracy to counterfeit currency and was awaiting sentencing in July of 2008. The defendant offered to let the victim's mother and her two children stay with him until they found a permanent residence, and she accepted this offer. When she began staying with the defendant, she and the defendant slept on the couch, and her children slept in the front bedroom of the house.

The defendant was frequently around the victim and his brother, and he initially treated them well. However, around the beginning of July, the defendant's attitude toward the children began to change. He told the victim's mother that she "bab[ied]" her children too much and needed to discipline them. He said that the children "were too sensitive" and "whine[d] too much." He would say these things both to the victim's mother privately and in front of the children. He would insult the children, calling them "b* * * *es and p* * *ies and say they were going to be f* * * *ts when they grew up." The victim's mother recalled that during the time period right before the victim died, the name-calling "seemed to happen all the time." She would confront the defendant about his language, but she felt that at the time she did not "have too many other options" in terms of residency. Her mother and two sisters lived in Knoxville, but none of her relatives had room to take in both herself and her children on a permanent basis. Several of her friends and the victim's paternal grandmother would watch the children.

The defendant was "sometimes" alone with the children, but these periods were brief and occurred only when the victim's mother would "take a shower" or if she "had to run across the street to the store for something."

The week of July 18th, the victim's mother recalled that the victim had been behaving as though he had a cold. While nothing appeared physically wrong with the victim, she observed that the victim, who was typically "full of energy," now only had "bursts of energy." The victim became tired "quicker than normal," would sleep for longer periods than normal, and did not display much of an appetite. The victim's mother gave the victim Tylenol, which seemed to dissipate the cold symptoms, but the victim still appeared "lethargic." Initially, she believed that the victim was simply "going through a growth spurt."

On July 18th, the victim's mother dropped her oldest son off at her mother's house and then went to see a movie with the defendant and the victim. After the movie, the three returned to the victim's mother's apartment, where the defendant sat on the porch while the victim played on the porch. The victim was within his mother's eyesight while he was on the porch, and she witnessed him fall while starting to walk down the porch steps. She went to check on the victim, and she observed that the skin on his back was slightly red but not broken. Later that evening, the victim's mother placed an ice pack on the victim. When a friend of hers visited the apartment to see the victim, the defendant went to the porch "and kind of had an attitude."

The victim's mother, the victim, and the defendant left her apartment and returned to the defendant's residence, where she prepared dinner. She placed the victim on the couch next to the defendant while she cooked. She prepared a plate for herself and one for the victim, and she sat down on the couch between the victim and the defendant. The defendant made a comment about the victim's mother "babying" the victim by giving him food off of her plate that caused her to lose her appetite. When the victim finished his dinner, he laid his head down on his mother's lap and fell asleep, and she soon fell asleep herself. The defendant was still on the couch when the victim and his mother went to sleep, and his mother recalled the defendant waking her up to tell her that he was taking the victim to the bedroom so that she could "stretch out" on the couch. The victim's mother assumed the defendant was taking the victim to the front bedroom, but she did not see the defendant after he walked around the couch. The victim appeared normal at this point, and she fell back asleep after the defendant exited the room with the victim.

Sometime later, the defendant woke the victim's mother and was holding the victim. The victim's mother could not remember exactly what time the defendant woke her or how long she had been asleep. She recalled that the victim appeared "limp" and that the defendant was asking her what was wrong with the victim because he was not breathing. The defendant was "hysterical," "pacing back and forth" and telling her "not to let [the victim] die." The victim's mother began questioning the defendant and asking what he had done because there was nothing wrong with the victim when the defendant took him. The victim was "gasping for air," and his eyes were "half open, but his pupils were dilated." She felt the victim's chest and discovered that his "heart was beating so fast, but it wasn't strong." She breathed into the victim's mouth, believing that he may have been choking on something. When she saw the victim's chest fill with air, she realized that the victim was not choking.

The victim's mother used the defendant's phone to call her mother, who told her to call 911. She informed the defendant that they needed to take the victim to the hospital, and she called 911 from the defendant's vehicle while he drove to the hospital. During the ride to the hospital, the victim was "gasping" and his lips were "turning dry."

Dr. Robert Dickson was the treating physician in the emergency room when the victim was admitted to the hospital. Dr. Dickson testified that the victim arrived around 1:30 a.m. on July 19th in "in full cardiopulmonary arrest," which meant that the victim was not breathing and did not have a pulse or heart rate. The victim's pupils were fixed and dilated, which was a sign of severe neurologic injury. When the victim was first admitted, Dr. Dickson did not notice any visible signs of trauma on the victim's body. As Dr. Dickson continued to treat the victim, he noticed that "some bruising" began to appear, and he recalled that there was a large retinal hemorrhage in the victim's right eye. He testified that retinal hemorrhaging was often caused by trauma. Doctors performed a neurological exam, which revealed no neurological activity and that the victim was brain-dead. Dr. Dickson was not

3

able to establish how the victim was injured, but he believed that the victim's prognosis was "bleak" based on his neurologic exam.

Debra Nuchols testified that she was an investigator in the family crimes unit of the Knoxville Police Department. She arrived at East Tennessee Children's Hospital around 4:30 or 4:45 a.m. on July 19th after receiving a call of suspected child abuse. Investigator Nuchols went to the victim's hospital room in the Intensive Care Unit ("ICU"), and she observed several "bruises or marks" visible on the victim's face. Shortly after she arrived, she contacted the crime lab to take photographs of the victim. She identified photographs of the injuries of the victim and confirmed that she was present when the photographs were taken.

The victim's mother and the defendant were in the hospital room with the victim after he was admitted, and the victim's mother recalled the defendant talking loudly. He would alternate between telling medical personnel to ensure that the victim was treated and telling the victim that "he can come out of it, he's going to be okay." The defendant paced around the room, appearing "frantic" and "panicked." Doctors transferred the victim to the ICU and informed his mother that the victim was brain-dead and needed to be placed on life support. After the victim was transported to the ICU, his mother left the hospital around 7:00 a.m. to return to her apartment to take a shower and change her clothes. The defendant drove her to her apartment.

The victim's mother returned to the hospital later that morning, and the defendant was with her. Upon her return, she voluntarily spoke with the Department of Child Services ("DCS") and the Knoxville Police Department, who showed her photographs of bruises on the victim's body. She did not recognize the bruises or know how the victim became bruised. She stated that she did not hit the victim or cause the bruises. When she gave the victim a bath on the evening of July 18th, she did not observe any bruises on the victim's body. She recalled that he had a scratch above his eye that he received after crawling to retrieve a ball and a mark under his eye from hitting the corner of a table. She observed "a whole lot more marks" on the victim in the photographs than the two cuts above and below his eye. The last time that she saw the defendant, he was in the hospital room with herself and the victim. The defendant exited the room after the victim's godfather instructed him to leave.

Before he left the hospital, the defendant spoke with Investigator Nuchols. Investigator Nuchols recalled that the defendant "seemed very nervous, almost on edge." In his statement to Investigator Nuchols, the defendant said that he returned to his apartment with the victim and his mother around 10:00 p.m. on July 18th and that the three fell asleep on the couch about an hour later. Investigator Nuchols testified that the defendant told her that after the victim and his mother fell asleep, he took the victim to the bedroom to give her more room on the couch. He returned to the couch and received a page from a friend, and he went to pick up the victim. When he picked up the victim, the victim appeared "lifeless," and the defendant

heard the victim making "some noise." The defendant went to wake the victim's mother and inform her that "there was something wrong with" the victim. The defendant did not offer an explanation for the victim's injuries, but he recalled seeing a small bruise on the victim earlier in the day, and he mentioned the incident where the victim fell down the stairs at his mother's apartment.

On cross-examination, Investigator Nuchols agreed that her written report of the defendant's statement did not say that the defendant took the victim to the bedroom and later picked him up off of the bed. She testified that her report stated that the defendant informed her that he picked the victim up from the couch after receiving a page from a friend.

Dr. Matthew Hill testified that he was assigned to the victim's case around 8:00 or 9:00 a.m. the morning of July 19th. Dr. Hill performed a neurological exam, which "showed no evidence of neuro[logical] function." At the time of the exam, the victim's body temperature had dropped to ninety-two degrees. The low body temperature indicated that the victim could not regulate his own body temperature, so doctors warmed his body over the course of the day in order to conduct a second neurological exam in the afternoon.

Dr. Hill also conducted a physical examination of the victim, and he testified that the exam revealed retinal hemorrhaging on the victim's eye. He stated that retinal hemorrhaging was "a sign of shaken baby or some sort of excessive trauma." He also observed that the victim began "putting out a lot of urine" around twelve or one p.m., which indicated that "the area of the brain that controls urine output was shut down."

Doctors were able to raise the victim's body temperature to a sufficient level to conduct a second neurological exam, and the victim did not respond to any of the tests. Doctors also conducted an apnea test to assess the victim's ability to breathe on his own. Doctors "preoxygenated" the victim and then removed him from the ventilator, recording the length of time that it took for the victim to breathe on his own. After the victim went seven minutes without taking a breath, doctors placed him back on the ventilator. Dr. Hill testified that the results of the apnea test indicated that the victim was legally brain dead.

Along with the second neurological test, doctors performed a second "head CT scan" in the afternoon. The victim had received an initial "head CT scan" when he arrived at the hospital "that was read essentially as normal." The second CT scan was performed about twelve hours later, and Dr. Hill testified that the scan "showed marked edema on the brain." Dr. Hill said that the second scan revealed swelling "everywhere" in the victim's brain, which indicated a "lack of oxygen and perfusion for an extended period of time." Dr. Hill stated that the test also revealed a "relatively small" subdural hematoma on the left side of the victim's brain.

Around 1:00 a.m. on the morning of July 20th, the victim began to show signs that he was not receiving an adequate flow of blood to his heart. The victim went into cardiac arrest, and doctors continuously applied epinephrine and CPR for "20–some–odd minutes," and they were unable to restore the victim's heart rate. His mother was in the hospital room while doctors attempted to resuscitate the victim. Dr. Hill told her that because neurological exams indicated that the victim was brain-dead, further efforts to resuscitate him were not likely to restore his brain function. He offered to stop the CPR treatments so that the victim's mother could hold the victim, and she indicated that she wished for the treatments to stop. The victim did not regain a heartbeat, and he was pronounced dead at 2:12 a.m. Dr. Hill stated that the likely cause of the victim's death was a brain injury, and he estimated that the degree of edema that the victim displayed indicated that he received his injuries ten to twelve hours before Dr. Hill arrived at the hospital.

The victim's mother attempted to contact the defendant to inform him that the victim had died and to tell him the date of the funeral. The defendant did not answer, and he did not attend the funeral. He contacted her later in the summer from a blocked phone number and told her that she needed "to keep [her] mouth shut, that [she] was trying to throw him under the bus by telling people that he killed" the victim.

Dr. Mary Palmer testified as an expert in child abuse pediatrics. She stated that on July 19th, she received a call from Dr. Hill regarding the potential maltreatment of the victim. Upon hearing that while a CT scan of the victim's brain "had not shown anything remarkable," the victim was not showing any brain activity, Dr. Palmer posited that the victim may have been strangled. She believed strangulation may have been used to abuse the victim because it would have stopped the victim's heartbeat and normal brain function without directly causing an injury to the brain that would have been visible on the first CT scan.

Dr. Palmer examined the victim around 5:00 on the evening of July 19th. As part of her examination, Dr. Palmer attempted to view and document the bruises on the victim's body. Dr. Palmer used eight photographs taken while the victim was in the ICU to assist her in explaining the victim's injuries. The photographs showed the victim in his hospital bed, along with bruises on his neck, chin, jawline, lower back, buttocks, and leg. Although she did not take the photographs herself, Dr. Palmer testified that the photographs were an accurate depiction of the victim at the time he was in the ICU. She identified petechiae in the photographs of the bruises on the victim's neck, which she testified was consistent with choking. She agreed that the victim's injuries to his chin and jawline were consistent with choking. Dr. Palmer testified that the injuries were of the type where the bruising may not have been immediately apparent. She believed that because the color pattern of the bruises on the victim's lower back, buttocks, and leg were consistent, the injuries were inflicted at the same time as the injuries to his neck and jaw area as part of one episode of injury. Dr. Palmer estimated that the injuries had been inflicted within twenty-four hours of her examination of the victim. She testified that the bruises

6

were not consistent with those that a child would receive during a normal course of play. She also testified that she believed that to a medical degree of certainty that blunt force trauma to the victim's body and strangulation caused the victim's injuries and that the injuries were not accidental.

Dr. Darinka Mileusnic–Polchan testified that she was the medical examiner who performed the autopsy on the victim. Thirty-one pictures from the autopsy were admitted into evidence. Dr. Mileusnic–Polchan testified that the photographs would be beneficial in explaining the victim's injuries to the jury, primarily because the victim suffered from multiple injuries that would be difficult to verbalize to the jury. She stated that the primary cause of the victim's death was strangulation and that blunt head trauma due to child abuse was a significant contributing condition in his death.

The defendant testified that he never had discussions with the victim's mother regarding her parenting and that he was never critical of her for "babying" her children. He stated that he fell asleep on his couch on the evening of the incident with the victim and his mother. He awoke to the sound of his phone beeping, and the victim's mother was beside him on the couch with the victim in her lap. He picked the victim up and noticed that "he was breathing heavy, like something was wrong with him." He told the victim's mother to call 911, and she insisted that they take the victim to the hospital instead. He drove the victim to the hospital, and he recalled that the victim's mother was performing chest compressions on the victim as they drove. He testified that he never told Investigator Nuchols that he took the victim from the couch and placed him in the bedroom. He stated that he spoke with the victim's mother on the telephone after he left the hospital and that he saw her "random[ly]" a day after the victim's death.

At the conclusion of the trial, the jury found the defendant guilty as charged of felony murder committed in the perpetration of aggravated child abuse and of aggravated child abuse.

*State v. Johnson*, No. E2013-02437-CCA-R3-CD, 2015 WL 1579873, at *1–6 (Tenn. Crim. App. April 6, 2015), *perm. app. denied* (Tenn. Sept. 17, 2015) ("*Johnson I*"). The TCCA affirmed the conviction, and the Tennessee Supreme Court denied permission to appeal on September 17, 2015. *Id.*

On September 2, 2016, the Criminal Court for Knox County filed Petitioner's pro se petition for post-conviction relief, which was verified under oath by Petitioner on August 26, 2016 [Doc. 9-2]. The TCCA summarized the post-conviction evidence as follows:

Petitioner did not testify at the post-conviction hearing. Trial counsel testified that he initially began representing Petitioner at his first trial in this matter for the sentencing hearing and motion for new trial. He said that Petitioner's motion for new trial was granted, and he represented Petitioner throughout his second trial. As relevant to the claims that Petitioner raises on appeal, trial counsel testified he did not recall if Petitioner's family and friends were separated in the courtroom by caution tape, and no one brought this to his attention. He was unaware of any conversations between the trial judge and the victim's mother or other family members. Trial counsel testified:

> Specifically I remember it being Rudy Dirl because I remember Mr. Dirl coming up and speaking with -- attempting to speak with [trial judge], and as I understand it, it was largely about basketball.
>
> [Trial judge] disclosed that fact to us in the morning because I do remember [Petitioner's] family reporting that it looked like somebody from [the victim's mother's] side was trying to converse with the judge. And we had a chambers meeting with [trial judge]. He explained what was said.
>
> He cautioned all the parties not to speak with him about anything anymore, and it really amounted to what we believe to be a non-issue after [trial court's] disclosure.

Trial counsel testified that he reviewed the transcripts from Petitioner's first trial in preparation for the second trial. He did not recall whether he asked the victim's mother at the second trial if she had any other children. At the time, trial counsel was aware that she "did in fact have other children." When asked why he did not cross-examine the victim's mother about her other children, particularly a child in the custody of the Department of Children's Services ("DCS"), trial counsel replied:

> Well, I remember that we successfully subpoenaed to the judge's chambers a DCS file that was given to [trial judge] for in camera review. That he did in fact review it. We were looking for exactly what you're suggesting, whether there were problems with her other children, and the DCS file gave no indication per [trial judge's] in camera review that there in fact had been any other problems with children that would be relevant or admissible in this case.

When asked if he was aware that one of the victim's mother's other children went to DCS custody, trial counsel testified:

> At this point I can't tell. I, I don't have a recollection of that now. I may have at the time, but I know that we explored through seeking the DCS files on [the victim's mother] and all of her children, any

issues that might be relevant to the defense of [Petitioner] in the instant case.

When asked if he would have used this information at trial if he had known about it, trial counsel asserted that he was not sure of its relevance but it was possible. He agreed that the victim's mother could have opened the door to admit this evidence if she had testified that she was a loving, caring mother who would never harm her children.

When asked if he recalled testimony from Petitioner's first trial by Dr. Mileusnic-Polchan indicating that the victim appeared to have been "whooped regularly," trial counsel testified: "I do remember some discussion about prior injuries, and I know that was part of our trial strategy, of course, that the injuries that were inflicted were either accidental or inflicted by the victim's mother." Trial counsel remembered an issue about the timing of the victim's injuries and tried to argue that the victim had prior injuries which occurred before the victim's death. He agreed that the victim's mother testified at the second trial that she spanked her children. Trial counsel specifically recalled questioning the victim's mother on cross-examination about the victim's prior injuries or a "healing injury." He had reviewed the transcript from Petitioner's first trial but did not specifically recall testimony from the first trial indicating that the victim had no food in his stomach at the time of death. Trial counsel testified that the "operating theory was that the child had other injuries and that either through accident or by the hand of [the victim's mother], that our theory was that's how the child died or at least there was a reasonable doubt as to [Petitioner's] involvement in the death of this child." He said that this was "exactly what we explored and exactly what we argued and exactly what we attempted to question on."

When asked if he questioned the victim's mother about speaking to the police after the victim's funeral and whether that would have opened the door and allowed him to question her about initially being charged in the case, trial counsel said that he made a tactical decision to not seek admission of that evidence because it would have allowed the State to give the reasons why they dismissed the charges against her. He noted that the issue was litigated "quite thoroughly pretrial." When asked if Dr. Mileusnic-Polchan's testimony that the victim looked well taken care of or Dr. Wisinewski's testimony that the victim appeared to be healthy at his last office visit would have opened the door to proof that the victim's mother's oldest child had been placed in DCS custody or any past child abuse, trial counsel said that he did not know if that would have been relevant. He further testified:

> Again, I can't recall specifically what, specifically -- if that testimony even occurred, and what tactical decisions were made at that time as it relates to, again, opening the door with Dr. Mileusnic[-Polchan] -- that's who you refer to as Dr. Polchan -- it could of, but it's safe to say that one must handle Dr. Mileusnic[-Polchan] very carefully on cross-examination from a number of experiences.

9

When asked why he did not request a mistrial when Debra Lamb, a hospital worker, testified at trial that boyfriends have a history of causing "these type of problems," trial counsel replied: "I very well may have made a request for mistrial at the bench, I don't recall. But I do recall that becoming an issue and making a timely objection and asking for a limiting instruction." He did not feel that this would have opened the door to testimony about the victim's mother's oldest child being placed in DCS custody, and "if the [c]ourt gave a limiting instruction, I think that is the curative measure and at that point there's not a door opens."

Trial counsel recalled Dr. Palmer crying during her trial testimony. He believed that it was addressed "slightly" or that they asked for a recess at that point, and he "noted it" and was concerned. However, trial counsel testified that he did not want to draw any further attention to the issue in front of the jury. He remembered a recess "very near in time to that event, and she regained her composure and we went on, or her testimony was in fact concluded." Trial counsel testified:

> And I remember speaking about it with [co-counsel], my partner, tried the case with me. And we decided we did not want to draw any more attention to it to the jury. It was not -- I would not describe it as sobbing or wailing but she was, she was obviously upset.

On cross-examination, trial counsel testified that when he began representing Petitioner in 2013, he had practiced law for approximately twenty-five years "almost exclusively criminal defense." He was also assisted by co-counsel who was a senior associate and had been practicing law for forty years. Trial counsel testified that when they learned Mr. Dirl had approached the trial judge, they were very concerned and "brought it up immediately." He said that they notified the State that night to "say that we have a report of someone speaking with the judge from the other side so to speak, and we need to raise this with the Court and make an inquiry." All parties met with the trial judge the following morning, and "he disclosed to us after we brought it up, very clearly what had happened." Trial counsel testified that the trial judge "disclosed it in open court, and I recall him saying, 'Please folks, you know, do not approach me from either side during the course of this trial.'"

Concerning his cross-examination of the victim's mother, trial counsel testified that his strategy was "that at least there was a reasonable doubt as to whether [Petitioner] would have committed this crime and either through accident or intent of another, was the reason for the death of this child but not [Petitioner]." He filed pretrial motions that were litigated in preparation for cross-examination of the child's mother. Trial counsel testified that victim's mother "was at some degree a negligent mother." He further said:

> I thought it would be difficult for the jury to believe that [the victim's mother] may have intentionally inflicted these injuries on

10

the child, but that it could be a possibility, but it was more likely that she was, she was on occasion inattentive and the child -- I know that there was a fall down some steps that there was some testimony about previously, but the child had been hurt and as a result there was a traumatic head injury that it would at least explain the brain trauma that occurred.

We always had difficulty trying to explain the strangulation evidence and things of that nature, but again, with [Petitioner] testifying that he really wasn't in a position to inflict any kind of such injuries, we had an overall strategy that at least there was a reasonable doubt as to whether [Petitioner] would have committed this crime and either through accident or intent of another, was the reason for the death of this child but not [Petitioner].

Trial counsel was unaware of any "gentlemen's agreement" between the prosecutor and the victim's mother to dismiss the charges against her in exchange for her trial testimony. He believed it was a "conscious decision" by the prosecutor because the "evidence was lacking to prove the mother guilty beyond a reasonable doubt of any culpability in this case[.]" Trial counsel testified that he "clearly" made a tactical decision not to introduce proof at trial that the charges against the victim's mother had been dismissed because "the State was going to be allowed to enter testimony and proof as to why it was dismissed to include the fact that she passed a polygraph." Although trial counsel thought that the trial court was incorrect about admitting the polygraph, he did not want that information in front of the jury, and he explained that to Petitioner.

Jennifer Cain, Petitioner's cousin, testified that she was present for Petitioner's second trial and was seated with Petitioner's family. She said that they were seated in the middle of the courtroom, and there "was yellow caution tape along the, the benches," and no other area of the courtroom was taped off. Ms. Cain described the trial judge as "an elderly white guy with glasses. He was tall, slim, bald-headed." Ms. Cain testified that she witnessed the trial judge talking with Rudy Dirl, the victim's mother's grandfather. She also claimed that the trial judge was in a room with the victim's mother and holding her baby. Ms. Cain testified that she reported the contact to Petitioner's father, and she took some pictures with her cell phone of the trial judge talking to Mr. Dirl and of him inside the room with the victim's mother and holding her baby.

Ms. Cain identified one picture as being taken on March 15, 2013, at 10:51 a.m. which depicted the trial judge holding the victim's mother's baby. She identified a second picture as being taken on March 13, 2013, at 5:08 p.m. of the trial judge and Mr. Dirl talking to one another. Ms. Cain then identified a collage of pictures, with a date of March 15, 2013, that included another picture of the trial judge walking out of the room where he had been holding the baby and one of him walking down a staircase. She identified a second collage of pictures with a date of March 14,

11

2013, that included pictures of Mr. Dirl having a conversation with the bailiff outside the courtroom. Ms. Cain clarified that although the pictures reflect that the trial judge was talking with Mr. Dirl on March 13, 2013, she witnessed a second conversation between the two men on March 15, 2013, but did not take any photographs. Ms. Cain testified that her mother, Joyce Preston, was present when the improper contact with the trial judge occurred. She said that she also saw the trial judge "coming down the stairs and talking to people."

Ms. Preston testified that she was present during Petitioner's second trial and directed Ms. Cain to take the pictures of the trial judge holding the victim's mother's baby. She claimed that she could clearly see the trial judge holding the baby in a room, and she could see the other individuals in the room with him, and she recognized them. On cross-examination, Ms. Preston agreed that the picture of the trial judge holding the baby was not clear and that the photograph was taken on March 15, 2013. Ms. Cain was not aware that there was no testimony taken and that the verdict was rendered that day. She said that they were on "recess" at the time.

The prosecutor testified and identified the room in Ms. Cain's photographs as an area in the District Attorney General's Office "which is the reception area as well as what we call the victim/witness waiting room." She did not see the trial judge enter that room at any time during the course of the trial, and she did not see him interact with any witnesses or hold a baby. She noted that the trial judge entered the room after the verdict was rendered on March 15, 2013, shook her hand, patted her on the back, and said that she did a good job on the trial. He then left. The prosecutor looked at photographs purportedly showing the trial judge leaving the victim/witness waiting room and noted that he was actually in a public area of the building that led to the outside area and "into the downstairs of the building." He was not in the office in any of the photographs. In a photograph that purportedly showed the trial judge holding the victim's mother's baby, the prosecutor described the photo as blurry, and the windows to the room were slightly tinted and covered with blinds that were generally kept closed. She did not see the trial judge inside the room in the photograph, she could "just see the reflection from the window on the other side of the -- what we call the non-smoking area outside." The prosecutor testified that she did not see the trial judge interact with the victim's mother or her child during the course of the trial, "he interacted with counsel."

The prosecutor identified the trial judge in a picture of the stairwell, which she said would have been taken after court had recessed for the day on March 13, 2013. She looked at the photographs described as being taken on March 14, 2013, and testified that there were no photographs that clearly depicted the trial judge discussing the case with any material witness. The prosecutor testified:

> During the course of the trial [the trial judge] did address with [the parties] that he had a brief interaction with someone that he did not realize was with the victim's family. He took that up in chambers. It

> may have also been taken up on the record, but other than that there were no other issues.

> The prosecutor also identified a photograph of a bailiff speaking with another individual. Although she could not tell from the photograph, she believed that the person was Mr. Dirl. The prosecutor noted that although Mr. Dirl was associated with the victim's family, he was not a witness in the case.

> On cross-examination, the prosecutor was asked why caution tape was used in the courtroom where Petitioner's family was seated. She replied:

>> I believe because of the number of people -- I can't be for certain -- everything was taken up on the record. I believe we had sectioned off -- when I saw "we," the Court had sectioned off areas so people would know exactly where to sit at the time.

>> When we do jury selection in particular, the number of jurors that were brought in, at least back when [the trial court] was on the bench, the jurors would have taken up at least one side of the courtroom for jury selection. So that also helps define where people can sit and not interact with the jurors.

> The prosecutor agreed that caution tape was routinely used in other trials to block off areas of the courtroom, and she was unaware of it being limited to where a defendant's family was located.

> The victim's mother testified that she and her baby and other family members were in the victim/witness waiting area during the course of the trial. She said that the trial judge never came into the area and never interacted with her or held her baby. The victim's mother testified that she never discussed the case with the trial judge.

*Johnson v. State*, No. E2022-00295-CCA-R3-PC, 2023 WL 6573725, at *6–10 (Tenn. Crim. App. Oct. 10, 2023) (footnote omitted) (no perm. app. filed) ("*Johnson II*"). The trial court denied the post-conviction petition on February 8, 2022. [Doc. 9-3]. Petitioner appealed to the TCCA, which affirmed the post-conviction court's ruling on October 10, 2023. *Johnson II*, 2023 WL 6573725. Petitioner did not seek review in the Tennessee Supreme Court.

On October 9, 2024, Petitioner filed his petition for a writ of habeas corpus under 28 U.S.C. § 2254. [Doc. 2]. The petition was purportedly signed on October 4, 2024, and included an affidavit executed on October 3, 2024. [*Id.*]. The envelope received by the Court reflects that the

13

package was tendered to the prison mailroom for mailing on October 7, 2024, which is also the postmark date. [*Id.*; Doc. 2-1].

On October 10, 2024, the Court ordered Respondent to file a response to the Petition. [Doc. 4]. Respondent complied by filing a motion to dismiss the petition as time barred. [Doc. 8].[1] Petitioner subsequently filed a response opposing the Motion. [Doc. 13]. This matter is ripe for review.

## II. STATUTE OF LIMITATIONS

The instant Petition for Writ of Habeas Corpus is subject to the statute of limitations of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). The issue of whether Respondent's Motion should be granted turns on the statute's limitation period, which provides:

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of –
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or the laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

---

[1] The Court granted Respondent's motion to waive the filing of the entire State-court record [*See* Docs. 10, 12].

14

>    (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S. C. § 2244(d)(1). The federal limitations period is tolled while a "properly filed application for State post-conviction or other collateral review" is pending. *See* 28 U.S.C. § 2244(d)(2).

## III. ANALYSIS

As noted above, the Tennessee Supreme Court denied Petitioner's application for discretionary review on direct appeal on September 17, 2015. *Johnson I*, 2015 WL 1579873. Petitioner did not file a petition for a writ of certiorari in the United States Supreme Court.[2] Therefore, Petitioner's convictions became "final" on December 16, 2015, when the ninety-day period for petitioning the United States Supreme Court expired.[3] *See* S. Ct. R. 13(1); *Lawrence v. Florida*, 549 U.S. 327, 333 (2007) (holding "direct review" within meaning of § 2244(d)(1)(A) includes review by the Supreme Court). The statute of limitations began running the next day, December 17, 2015, and ran for at least 253 days, until Petitioner stopped the limitations clock by signing his post-conviction petition under oath on August 26, 2016. *See* 28 U.S.C. § 2244(d)(2); *Brand v. Motley*, 526 F.3d 921, 925 (6th Cir. 2008) (holding absent evidence indicating otherwise, date document is signed is considered the date it is handed to prison authorities for mailing); *Cook v. Stegall*, 295 F.3d 517, 521 (6th Cir. 2002) (holding federal habeas application is deemed filed when handed to prison authorities for mailing). The statute of limitations was tolled during the

---

[2] Petitioner represents that he filed a petition for a writ of certiorari in the Supreme Court [Doc. 2 at 9–10], but Respondent maintains there is no indication that he did so [Doc. 9 at 16 n.1]. And in his response opposing Respondent's Motion, Petitioner does not contest Respondent's assertion [*See generally* Doc. 13].

[3] Here, § 2244(d)(1)(A) applies, because it is the latest and most relevant of the four subsections, and Petitioner does not plead anything that would invoke the others.

15

pendency of Petitioner's post-conviction proceedings, which concluded on December 11, 2023, when Petitioner could have, but did not, seek discretionary review with the Tennessee Supreme Court following the TCCA's October 10, 2023, order affirming the denial of post-conviction relief. [Doc. 9-3]. *See* TENN. R. APP. P. 11(b) (providing petitioner with sixty days within which to file application for permission to appeal to Tennessee Supreme Court).[4] [5]

The statute of limitations began running the following day, December 12, 2023, and it expired 113 days later on April 3, 2024 (366-253=113).[6] Therefore, the statute of limitations had already expired when Petitioner placed his federal habeas petition in the prison mailing system on October 7, 2024. [Doc. 2 at 48]. Accordingly, Petitioner's federal habeas petition was not timely filed, and the Court can consider its merits only if Petitioner establishes an entitlement to equitable tolling of the limitations period or demonstrates a "credible showing of actual innocence." *See Allen v. Yukins*, 366 F.3d 396, 401 (6th Cir. 2004) (finding it is the petitioner's burden to

---

[4] It is unsettled among federal courts in Tennessee whether the statute of limitations for federal habeas actions is tolled during Rule 11's sixty-day window if a petitioner never requested discretionary review by the Tennessee Supreme Court. "The issue arises from the language in 28 U.S.C. § 2244(d)(2), which states that '[t]he time during which a *properly filed application* for State post-conviction or other collateral review with respect to the pertinent judgment or claim is *pending* shall not be counted toward any period of limitation under this subsection.' § 2244(d)(2) (emphasis added). . . . [S]ome other circuits appear to interpret this subsection in a way that allows tolling of the limitation period for the time in which a petitioner could seek post-conviction review for purposes of § 2244(d)(2) regardless of whether such review is actually sought." *Taylor v. Palmer*, 623 F. App'x 783, 786 (6th Cir. Aug. 14, 2015) (citing cases).

The Court does not attempt to resolve the issue here, but rather, affords Petitioner the most generous interpretation of the tolling rules, as the Petition remains untimely either way.

[5] The sixty-day period expired on Saturday, December 9, 2023. Because the time period expired on a weekend, however, the limitations period was extended through the next business day. *See* FED. R. CIV. P. 6(a)(C).

[6] Because 2024 was a leap year, the Court, like Respondent, assumes for the sake of argument that Petitioner had 366 days to file a timely habeas petition.

16

demonstrate equitable tolling applies); *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) (holding "credible showing of actual innocence" may overcome AEDPA's limitations period).

A petitioner is entitled to equitable tolling "if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in the way and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2010) (internal quotation marks and citation omitted). It is a doctrine that "allows courts to toll a statute of limitations when a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control." *Robertson v. Simpson*, 624 F.3d 781, 783 (6th Cir. 2010) (citation and internal quotation marks omitted). But it is applied "sparingly." *Id.* at 784. In fact, "[a]bsent compelling equitable considerations, a court should not extend limitations by even a single day." *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 561 (6th Cir. 2000). The party seeking equitable tolling bears the burden of demonstrating its applicability. *Allen v. Yukins*, 366 F.3d 396, 401 (6th Cir. 2004).

In both his Petition and his response to Respondent's Motion, Petitioner argues that his attorney is at fault for the Petition's untimeliness, as Petitioner retained counsel in 2019 and paid counsel to file both an application for review in the Tennessee Supreme Court and a federal habeas petition. [Doc 2 at 4; Doc. 13 at 1]. Petitioner states that this unidentified attorney told Petitioner's family in October 2023 that he was working on Petitioner's case, and thereafter, neither Petitioner nor his family could contact the attorney "for several months." [Doc. 13 at 1–2]. Petitioner maintains that he learned through a family friend that his attorney had changed locations and his telephone number without telling Petitioner. [*Id*. at 2]. Petitioner contends that his brother finally spoke with the attorney in October 2024, and the attorney stated that he "forgot [the] timeline" and would file for clemency for Petitioner. [*Id.*]. Petitioner tried to hire another lawyer, but no one

17

would take his case because he had retained counsel. [*Id.* at 3]. Therefore, Petitioner maintains, his attorney's negligence and neglect warrants tolling of the federal limitations period. [*Id.* at 2].

While a "garden variety claim of excusable neglect" does not generally entitle a petitioner to equitable tolling, *Holland*, 560 U.S. at 651–52, attorney abandonment may warrant its application, *Maples v. Thomas*, 565 U.S. 266, 283 (2012). In the case of attorney abandonment, "a client [cannot] be faulted for failing to act on his behalf when he lacks reason to believe his attorneys of record, in fact, are not representing him." *Maples*, 566 U.S. at 283.

The Court assumes for the sake of argument that counsel's failure to file for relief on Petitioner's behalf constitutes an "extraordinary circumstance[.]" Nonetheless, the Court finds equitable tolling is not appropriate in this case, as Petitioner has not demonstrated that he pursued his federal remedies with reasonable diligence. For instance, Petitioner does not identify the dates that he attempted to get in touch with retained counsel.[7] Additionally, Petitioner does not state that he made inquiries with the State or federal courts at any time to determine whether an application for relief was pending on his behalf. Further, he does not explain why, when he was unable to reach counsel for "several months," he did not take action to protect his federal rights. And Petitioner does not state that he did not know of the TCCA's decision affirming the denial of post-conviction relief, nor does he allege that he was unaware of the federal statute of limitations. Accordingly, the Court finds Petitioner's failure to monitor the progress of his case or make efforts to safeguard his federal rights keeps him successfully arguing that he displayed the type of diligence required to warrant equitable tolling, and neither his pro se status or unfamiliarity with

---

[7] Petitioner does not identify the counsel he retained in 2019, and since his post-conviction proceedings were ongoing at that time, it is unclear whether post-conviction counsel and the attorney blamed for his untimely federal habeas petition are the same individual.

18

the law excuse his untimely filing. *See Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 463–64 (6th Cir. 2012) (citing *Winkfield v. Bagley*, 66 F. App'x 578, 583–84 (6th Cir. 2003)).

Although Plaintiff has not asserted that his Petition should be deemed timely because he is actually innocent, the Court notes that actual innocence, if proved, serves as a gateway through which a petitioner may obtain review of his otherwise barred or untimely claims of constitutional violation. *See McQuiggin*, 569 U.S. at 386; *see also Schlup v. Delo*, 513 U.S. 298 (1995); *House v. Bell*, 547 U.S. 518 (2006). In this context, "actual innocence means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998) (citation and internal quotation marks omitted). Invocation of this exception requires the claim of innocence to be credible. *Cleveland v. Bradshaw*, 693 F.3d 626, 631 (6th Cir. 2012) (citing *Souter v. Jones*, 395 F.3d 577, 601 (6th Cir. 2005)). To be credible, a claim of actual innocence must be supported "with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. To establish his entitlement to the actual innocence exception, a petitioner bears the burden of demonstrating that it is more likely than not that no reasonable juror would have convicted him in light of new evidence. *McQuiggin*, 569 U.S. at 386; *Schlup*, 513 U.S. at 327.

Here, Petitioner does not present any arguments related to new evidence—credible or otherwise—and he may not avail himself of the actual innocence argument to overcome the statute of limitations in this case.

## IV. CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11(a) of the Rules Governing § 2254 Cases, this Court must issue or deny a certificate of appealability ("COA") upon the entry of a final order adverse to the petitioner. Additionally, Petitioner must obtain a COA before appealing this Court's decision denying federal

habeas relief. *See* 28 U.S.C. § 2253(c)(1). Because the instant petition is rejected on procedural grounds, Petitioner must demonstrate "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling" in order for a COA to issue. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Applying this standard, the Court concludes that a COA should be denied.

## V. CONCLUSION

For the reasons set forth herein, Respondent's Motion [Doc. 8] will be **GRANTED**, and this federal habeas petition will be **DISMISSED WITH PREJUDICE**. A certificate of appealability will be **DENIED**. An appropriate judgment order will enter.

**SO ORDERED.**

/s/*Charles E. Atchley, Jr.*
**CHARLES E. ATCHLEY, JR.**
**UNITED STATES DISTRICT JUDGE**